GEORGE F. ROBENSON, plaintiff in error, *vs.* DAVID A. VASON, *et al.*, defendants in error.

Fraud in the procurement of a note, as specified in the Revised Code, means fraud in the procurement *by the holder thereof.* An innocent holder of a note for value before due, will be protected, although the note may have been fraudulently procured by the payee from the maker, of which the holder had no notice.

Equity. Motion to dissolve injunction. Decided by Judge COLE. From Dougherty County. Chambers. July, 1867.

On the 31st of October, 1865, George F. Robenson married Lucy Bartlett, a ward of David A. Vason. She was at

Robenson *vs.* Vason, *et al.*

that date a minor, and resided in Dougherty county. The marriage license was issued by the Ordinary of Baker county, and without the consent of the mother or guardian of the ward.

When Robenson and Vason proposed settling the accounts between Vason and said ward, various preliminary investigations were had, which resulted in submitting the matter to the arbitrament of G. J. Wright and W. E. Smith, attorneys at law, with full powers to investigate fully "all the matters involved, and make an award covering the same, so that the same shall be a termination of all matters of dispute between said parties." The matters mentioned in the submission as being for determination, were, a settlement "for all the property, assets and credits due said minor," and whether Robenson, in right of his wife, could discharge Vason from his trust—Vason "having some doubt" whether Robenson could discharge him, because "the marriage was irregular and informal," for the reason that said license was taken out not in Dougherty county but in Baker, and under the circumstances aforesaid.

The arbitrators found, from the facts agreed on by the parties and submitted to them, that the ward owed Vason $9,500.00, adding "but as large receipts, expenditures and advancements had been made by Vason in Confederate treasury notes, said sum should be abated to $6,000.00 due Vason January 1st, 1865, this settlement being agreed to and confirmed by the parties themselves, said Vason, Robenson and his wife Lucy. Therefore we award the above as a full, final and complete settlement between the parties." They said nothing as to the validity of the marriage. Afterwards, to-wit: on the 25th of November, 1865, Robenson gave to Vason his two promissory notes, each for $3,639.00, drawing interest from 1st January, 1865, due on the 25th days of December, 1866 and 1867, respectively, in settlement of said six thousand dollars award, and of twelve hundred and seventy-eight dollars for a house and lot known as numbers 65 and 67, on Flint street, in Albany, Georgia, sold to Robenson

by Vason. And to secure the payment of the notes, Robenson gave to Vason a mortgage.

The mortgage recited said two items of indebtedness, and described said two notes, stated that Vason, as such guardian, had fully settled with Robenson in right of his wife, and had turned over to him "the plantation in the 14th district of Lee County, known as the Chehaw Place, formerly the property of John H. Pope, known as numbers 17, 18, 19, 46, 47, 51 and 52 in said district, making in the aggregate fourteen hundred acres more or less, also between seventy-five and one hundred head of cattle, eight or ten head of mules and horses, two wagons, one yoke of oxen and cart, forty head of sheep, one hundred and twenty-five head of hogs, all the plantation tools and utensils, the crop of cotton not yet packed, corn, fodder, and all otner perishable property on said plantation."

It then conveyed to Vason, his heirs and assigns, all of said property, real and personal, "under the following terms and stipulations, to-wit: That if said Robenson shall pay the amount of money specified in each of said promissory notes, and interest thereon, as they respectively fall due, then this mortgage shall be considered as discharged thereby. And in case of default of payment in either of said promissory notes, the said Vason, his heirs and assigns, may either proceed to foreclose this mortgage on any of said property or the crops which may be grown on said plantation, under the statutes of this State, or the said Vason, his heirs or assigns, may proceed to sell any portion of said property for the purpose of discharging said notes, upon giving thirty days' notice thereof to said Robenson, his heirs or assigns, which said sale, if it shall become necessary, said Robenson hereby binds himself, his heirs and assigns, fully to satisfy and execute, and hereby acknowledges himself as tenant-at will of said Vason, his heirs and assigns, as to the whole of the property hereinbefore mentioned, for the purposes aforesaid."

On the sixth of June, 1866, this award was made the judgment of the Superior Court of Dougherty county, and thereupon judgment was entered in favor of David A. Va-

son against Robenson for six thousand dollars principal, with interest from the first day of January, 1865, and costs. (This fact was not noticed in the argument.) In October, 1866, Robenson filed a bill in equity, averring among other things that Vason, as the guardian of his wife, had taken into possession a large amount of cash and personalty, say $30,000.00, and managed it all for her from 1852 to 1858, that he in 1858, as such guardian, bought for her the " Chehaw Place," under an order of Court for that purpose, cultivated the farm for her, making large profits all the time, except for 1863 and 1864.    It showed the status of affairs as they appeared by Vason's returns.

It was averred that while a balance seemed to be against the estate, it arose because Vason had counted large expenditures in Confederate money at par, that he wished to scale this money to a sound currency and Vason was unwilling to do so, giving as a reason that when he bought the " Chehaw Place," on 1st January, 1858, the assets of the estate being mostly in notes, though perfectly solvent, they were not available, and he (Vason) had advanced of his own money $15,000.00 to make said purchase, and being in no haste to collect these good interest-bearing notes, he had held them—the interest on the notes balancing the interest on his advances— until during the war the makers of said notes paid them to him in Confederate money, and it required the whole of the same, so paid in, to defray the expenses of the estate, and left nothing to repay his advance, which he still claimed against the estate.

In explanation why the expenditures of 1863 and 1864 had exceeded the income, Vason stated that he had bought stock and implements and made improvements to put the place in good order, (a list of what he claimed to have bought, etc., is in the bill).    Vason further represented that there was on the place then, cotton housed, enough for twenty or twenty-five bales.    Vason had made no return for 1865, but said that there would be but little balance either way for that year.

Believing these representations to be true, and not for any

other reason, Robenson made the settlement aforesaid, and to secure Vason made the said mortgage.

The returns are set out by exhibits to the bill and are charged to be erroneous, and all of said representations are said to have been false, and a long list of facts and circumstances is given to prove the charges.

It is further averred that Vason pretended to have transferred the said notes and mortgage to his son William J. Vason and his son-in-law William Gilbert, and they pretended to have transferred them to Ross, of Macon, Georgia, and Robenson believed all of the parties had notice of his having good reasons for not paying the notes. He prayed that all of the notes, except the part for $1,278.00, be cancelled, that Vason should account and settle with him, and that all the parties be enjoined from proceeding to collect the amount, to-wit: of $6,000.00 which he denied owing. Disclaiming discovery, he prayed for general relief, etc.

Judge Richard H. Clarke, on the 23d October, 1866, ordered injunction to issue, upon Robenson's giving bond for damages, etc.

W. J. Vason and William Gilbert's answer of the bill is a disclaimer of any knowledge of the state of David A. Vason's account as such guardian, or of the facts and circumstances of the settlement, except what they learned in and from the mortgage. As to the transfer of the notes and mortgage, they answered that in September, 1866, they wished to enter upon the business of merchants in Albany, Georgia, and wished the aid of David A. Vason, who, upon their application, transferred the notes and mortgage to them, giving to them each one-half of the first note, and letting them take the second note upon their agreeing to pay him the amount called for by it, at its maturity.

They bought of J. B. Ross & Son about $5,300.00 worth of goods, and on the 13th of September, 1866, they transferred to J. B. Ross & Son said notes and mortgage as collateral security for said debt and such credit as they might give Vason & Gilbert thereafter. They positively deny knowing any defence to the notes at the time they took and

transferred them, and state that they did both in good faith, believing the notes would be paid at maturity.

J. B. Ross & Son adopted the answer of Vason & Gilbert as to the transfer to themselves, and stated that when they took the notes and mortgage, they relied upon the recitals in the mortgage as true, saw that it was duly recorded and, *bona fide*, took them as such security before they were due, and without any knowledge that Robenson had any reason for not paying them.

By way of cross-bill, they averred that they were informed and believed that Robenson had clandestinely brought cotton to Macon and sold about three thousand dollars' worth of the same, and had other cotton in Macon secreted to keep from paying these debts, that the cotton was the most available and proper source for funds to pay them, that Robenson was a spendthrift, etc., and had no other property but that which was mortgaged, and that if they had to sell the property to pay the first note it would endanger the security for the second. They prayed for the dissolution of this injunction, and for an injunction to restrain Robenson from disposing of the mortgaged property, and that a receiver be appointed to take possession of it all till further order.

On the 17th November, 1866, John T. Clarke, Judge of the Pataula Circuit, ordered that upon Vason & Gilbert and J. B. Ross & Son giving bond to pay Robenson all damages, etc., injunction as prayed for should issue against Robenson, and that Robenson should show cause why a receiver should not be appointed. Bond was given and injunction issued.

The questions involved in the pleadings were argued before David Irwin, Judge of the Blue Ridge Circuit, at December Term, 1866. He ordered that the first injunction be dissolved, and that the injunction against Robenson be dissolved upon his giving bond for $5,000.00 for the forthcoming of the property to answer any judgment on the notes or mortgage, and that upon his failure to give this bond, one Stokes should take possession of the property, as receiver. Robenson gave the bond.

On the first day of March, 1867, Robenson was notified in writing by the attorneys claiming to represent J. B. Ross &

Son, that in pursuance of the contract, under said mortgage, they would, on the 2d day of April then next, proceed to sell all of said property, (not stating how they would sell, or where,) and demanding that as their tenant-at-will, Robenson should deliver possession of all the property to them on said day in April, not waiving any right to demand it sooner.

Thereupon Robenson filed an amendment to his bill. Reciting all the foregoing facts by averments and exhibits, he further stated that Judge Irwin's decision was put upon the ground that he could defend at common-law; that the defendants were evading the spirit of that judgment by undertaking to sell the property under said notice and not by foreclosure or suit; that the consideration of the notes was indebtedness incurred prior to June, 1865, and was therefore within the provisions of the "stay law;" that much of the property mortgaged was not in existence and was therefore too uncertain a basis for a lien; that the notes and mortgage were obtained from him by fraud, and *therefore were void in all hands;* that Ross & Son only held them as collateral security for a debt which he believed had been paid or arranged, and that Ross & Son had then no real interest in the notes and mortgage and did not authorize this notice, but that it was in fact the other defendants who were moving in the matter; and of all these matters he prayed discovery from J. B. Ross & Son.

He further averred therein that when David A. Vason asked him for the mortgage, he went into Vason's office and signed it, without knowing that it contained any such power of sale, and that he never knew it did, till recently he heard that Fred H. West, Esq., attorney for the Vasons & Gilbert, said the mortgage was a "thirty day paper." He averred that such sale was irregular and would be ruinous to him, that his defence was not complete at law, and prayed that all the parties be enjoined from selling the property under said notice, or otherwise interfering with the same.

Judge Cole, of the Macon Circuit, granted the injunction last prayed for on the 12th of March, 1867.

J. B. Ross & Son answered. They admitted the recitals as

to the former proceedings in the premises, but denied that Judge Irwin's order was upon the ground stated, or that they were violating its spirit; they denied all knowledge of the consideration of the note being indebtedness prior to June, 1865, and stated that the power of sale was unrestricted by the stay-law, even if that law were constitutional: that so far from their debt being paid or arranged, Vason & Gilbert then owed them $8,422.22, and they held the notes and mortgage as collateral security for the same, and though Vason & Gilbert had the possession of them, it was only to enforce payment, and though they did not authorize the said notice given, they then fully ratified the same. They reiterated that they were *bona fide* holders, etc., and prayed for dissolution of the injunction.

The answers of William J. Vason and Gilbert are substantially the same as the last answer of J. B. Ross & Son. They say that the collecting agent of Ross & Son was urging them to collect the money, and they gave " to the attorneys in the case" the notes and mortgage, with instructions to make the money as soon as possible.

David A. Vason, still insisting on his demurrer filed in the case, now answered the original bill and the amendment, giving a history of his guardianship, explaining the various charges as to the management of the property, and denying all fraud in procuring the notes and mortgage, and denying that he made the representations charged. He said the mortgage was read by Robenson and closely scrutinized by his attorney, Gen. Wright, before it was executed; that he transferred the notes and mortgage to Vason & Gilbert as stated by them, etc. He stated that he had told Mr. Warren, one of Robenson's solicitors, that he was willing to open the settlement, no application was made for the purpose, and he thought the controversy was ended till this bill was filed.

He insisted that by the award having been made the judgment of the Court, the whole matter was *res adjudicata* as to him, that Judge Irwin had settled the rights as between the other parties, and that the "stay-law," if applicable to said

notes, was no hindrance to a sale under the power of sale granted in the mortgage.

This answer was excepted to at the hearing for uncertainty and evasiveness, and for uncertainty for want of an exhibit of his returns, for not stating to whom his ward's funds were loaned out and when collected, what were collected before and what since the war, etc.

On April 2d, 1867, John A. Vason and Fred H. West, solicitors for the defendants, gave notice of a motion to dissolve this last injunction, on the grounds that there was no equity in the bill and amendment, that the questions in the amendment had been adjudicated, and that if there was any equity in the bill and amendment, it was sworn off by the answers.

At the hearing, the defendants read an affidavit of C. M. Pope, to the effect that Robenson and his wife had staid some time at the " Chehaw Place" before it was turned over, and must have known the condition of it; an affidavit from John H. Pope, to the effect that an affidavit which he had sworn to at Robenson's instance, was sworn to without his having read it or knowing what it contained, that the place was in tolerably bad condition when Robenson took possession of it, and some of it had to be repaired ; the screw was in bad condition, as it had been shortly before broken in packing the crop of that year; that the balance of the crop (say twelve bales) was packed at deponent's screw; he did not know the condition of the tools nor the quantity of provisions on the place, but did know Robenson had sixty or seventy hogs penned to fatten, and almost all the plantation cultivated in 1865 was in corn, and the corn crop ought to have been very large; Robenson had more persons and more stock to feed in 1866 than there were in 1865, he knew not how much cotton was gathered in 1865, but the overseers at the time estimated the crop at twenty-five bales; that the property specified in the mortgage was on the place except that as to the mules and horses and cattle, the number he did not know, but the stock of cattle was fine, twelve mules and horses, though two of them were of little value and none

of them as fat as they might have been had they been better cared for ; and an affidavit of J. E. Higginbotham, to the effect that he drew the mortgage and read it over to Robenson, who also examined it, and it was examined by G. J. Wright and pronounced all right, Robenson said he was well satisfied with the settlement, and Vason voluntarily divided the payment so that Robenson could pay with his growing crops, which Robenson said he could do without embarrassment.

Complainant submitted the following *ex parte* evidence. An affidavit of H. T. Mast, stating that he bought two bales of cotton and forty or fifty bushels of corn from the place about two months before Robenson took possession; an affidavit of G. M. Stokes, that two or three months before Robenson got possession, he had bought from the place one hundred bushels of corn and one hundred and twenty-five bushels of cotton seed ; an affidavit of C. M. Pope, to the effect that he turned over to Robenson the plantation and what was on it, to-wit : nine mules, four of them being very good but not in first-rate order, two so-so, and the other three perfectly worthless, twelve medium-sized bales of cotton, 1,000 bushels of corn, (400 bushels of which belonged to the freed laborers as wages of 1865, and 250 or 300 bushels of it belonged to the South-Western Railroad Company to whom it had been sold but not delivered,) about forty-five head of meat stock, forty-five or fifty head of cattle, twenty-six sheep, with what tools there were, there was not a plough stock and none of the tools were of any value, the cribs, mule-shed and screw were worthless and the fencing in " miserable order," no crop could be made there without great expense and labor ; affidavit of John H. Pope, to the effect that when Robenson took possession of the place, it was not in condition to make a crop upon, until great labor and expense were put on it, that there were not sufficient farming tools to prepare and plant a ten acre wheat-field, that there was not sufficient corn and meat to last longer than in the Spring, there were but twelve bales of cotton of medium size, which had to be packed at his screw because the screw on the place was worn

out, nine or ten mules, all in bad order and three of them worthless, the fencing was dilapidated, the mule-shed, cribs and screw were unfit for use.

Complainant also read the affidavit of William A. Maxwell, explaining that from him, as assignee of John H. Pope, in 1858 Vason, as such guardian, bought the "Chehaw Place" and some stock, etc., and paid for it thus : $8,225.32 by a debt due from John H. Pope to him as such guardian, and about $5,350.00 in a claim of Stephen Thomas against John H. Pope, (the payment to Thomas being assumed by Vason,) and the balance in other claims against John H. Pope, but paid nothing in cash, and further that the place if well managed would have paid a profit, but it had been badly managed ; and an affidavit of John H. Pope, giving the same statement as to how the place was paid for.

It was admitted that Vason had before 1st January, 1858, collected, as such guardian, W. H. Bartlett's note $1,000.00, J. T. & T. C. Spicer's note $1,788.86, R. Lindsey & W. B. Roberts' note $1,098.56, J. H. Pope & A. Pope's note $3,210.00, T. D. Mathews & D. A. Vason's note $300.00, Dudley Sneed's note $1,111.31, W. M. Roberts' note $1,200, James J. Mayo & Stegall's note $1,175.00, J. S. Dunham & B. Clark's note $200.00, and P. Nightingale's note $5,890.00, with interest on each, swelling the amount to $18,157.35.

Complainant also read the affidavit of L. P. D. Warren, one of his solicitors, to the effect that he told Vason that Robenson was dissatisfied with the settlement, that Vason said he was sorry he did not know it before because he had transferred the notes, but that while he would not open the settlement, he would correct any error ; that he told Vason that he had represented that there were twenty-five bales of cotton on the place when there were but twelve, that Vason said he had not charged that cotton in the settlement and therefore it had nothing to do with it, and that he replied that with that cotton Robenson would have been greatly aided in farming :

An affidavit of W. E. Smith, Esq., Vason's arbitrator, that he and Gen. G. J. Wright, for Robenson, were trying to

settle the accounts and differing, had agreed that from the returns Vason was entitled to $9,500.00, and in the meanwhile Robenson and Vason had agreed to settle at $6,000.00; that this settlement was made upon Vason's statement that he had paid out $20,783.03 in purchasing the "Chehaw Place," paying of the ward's assets $5,000.00, and advancing out of his own funds about $15,000.00, because then the ward's assets were unavailable, and that he afterwards during the war collected these assets in Confederate money, and collected most of his private claims in the same currency; Vason wished the cotton applied to the payment of this $6,000.00, but Robenson needed it to make a crop, and Vason yielded and took security (mortgage); he understood Vason to say there were twenty or thirty bales of cotton on the place, three packed and the others in lint, but was not positive of the number nor that they were of the crop of 1865. Another affidavit of W. E. Smith, that they were not acting as arbitrators nor knew that any award was to be made till after the settlement was agreed on, that Vason presented the submission and at once they signed the award, not as fixed by the arbitrators but as agreed on by the parties:

An affidavit of George Robenson, stating that John H. Pope's affidavit was read over and corrected by Pope before Pope swore to it, and that though he had visited the "Chehaw Place" before he got possession, he was there but twice, staid only a few hours the first time and a day and night the second time, and did not inspect the condition of its affairs:

An affidavit of Gen. G. J. Wright, in substance the same as Smith's upon the matters alluded to by Smith, but more in detail: he further stated that Vason made to him the representations of the condition of place as charged in the bill, that he communicated them to Robenson, and that upon them and upon the faith of the cotton being sufficient to enable him to make a crop, Robenson, against his advice (as to the legal view of Vason's position assumed in their interviews,) made the settlement, and then for the first time was anything said about an arbitration, and that he and Smith both stated that their judgments were not satisfied, but they

would sign the paper as agreed on ; that they were not sworn, etc. ; and that he saw the mortgage, but did not read it because Vason told him it was merely a mortgage.

Judge Cole refused to dismiss the bill, but dissolved the injunction last aforesaid.

The judgment of dissolution is assigned as error.

WRIGHT & WARREN, W. A. HAWKINS, for plaintiff in error, said the note, if procured by fraud, was void even in the hands of a *bona fide* purchaser for value, and cited New Code, sections 2735, 2737, 2715, 2589, 3117, 3113, 3598, 3140, 3109; Story on Pr. Notes, 192, 223, 228 ; Bailey on B., 143; Story's Con. of L., 243; S. Eq. Juris., 296 ; Price Rep., 281; 3d Kent C., 79–80; 8th Humph. R., 127 ; 1st Ep. R., 261; 8th Ga. R., 556; 21st Ga. R., 195; and that the powers granted in the mortgage were illegal, and cited 26th Ga. R., 203 ; New Code, 1956 ; 1 Vern. R., 33, 191, 234; 2d Vern. R., 520; Powell on M., 152, 158.

STROZIER & SMITH, JOHN A. DAVIS and F. H. WEST, for defendants in error, furnished no brief to the reporter.

WARNER, C. J.

The error assigned to the judgment of the Court below in this cause, is the dissolution of the injunction.    As the bill is retained for a hearing upon its merits between the original parties, we shall express no opinion upon the facts involved in it, except so far as the same may relate to the order dissolving the injunction.    The injunction was granted to restrain the sale of the mortgaged property under a power contained in the mortgage.    The main question in the cause which was made on the argument before this Court, is whether Ross & Son were *bona fide* holders of the notes and mortgage under the provisions of the Revised Code, and entitled to be *protected*.    It is insisted that the notes and mortgage were procured by fraud, as between Vason and Robenson, and that being so, although Ross & Son may have become the holders thereof before due, for a valuable consideration,

Robenson *vs.* Vason, *et al.*

and without notice of any fraud in the procurement of the same, as between the original parties to the transaction,—yet under the peculiar language of the Code, they cannot be protected as *bona fide* holders thereof for value.  The 2743d section of the Revised Code declares that "The *bona fide* holder for value of a bill, draft or promissory note, or other negotiable instrument, who receives the same before it is due and without notice of any defect or defence, shall be protected from any defenses set up by the maker, acceptor or endorser, except the following : 1st, *Non est factum ;* 2d, Gambling, or immoral and illegal consideration ; 3d, Fraud in its procurement."  The 2745th section of the Revised Code further declares that "The holder of a note is presumed to be such *bona fide* and for value ; if either fact is negatived by proof, the defendants are let in to all their defenses ; such presumption is negatived by proof of any fraud in the procurement of the note."  It is insisted that the words " fraud in the procurement of the note," should be interpreted to mean fraud in the procurement of the note as between the original parties to the transaction ; that if the note is fraudulently procured by the original payee from the maker, no one can be a *bona fide* holder thereof, with or *without* notice of the fraud.  To give to the Code this interpretation, the effect would be greatly to impair if not to destroy the negotiability of commercial paper.  We can hardly suppose that the legislature intended to do that.  Construing the Code in the light of the common-law, with a view to its practical effect, we hold that fraud in the procurement of the note, as used in the Code, means fraud in the procurement of the note by *the holder thereof*, and not fraud in the procurement of the note as between the original parties, of which the holder for value had no notice.  This construction makes a party responsible for *his own fraudulent conduct*, and does not make an *innocent* party responsible for the fraudulent conduct of others, of which he had no knowledge.  This question, however, is not entirely free of difficulty, but in our judgment, the construction which we have given to the Code, is the best and safest, in a *practical* point of view.  As a general proposition,

the power to mortgage would seem to include in it a power to authorize the mortgagee to sell, on default of payment,— Wilson vs. Troup, 7th John. Chan. Rep., 32.    In this case, there is an *express* power given by the mortgagor to the mortgagee or his assignee, to sell the mortgaged property in default of payment, upon giving thirty days notice.    In our judgment, Ross & Son being the innocent holders of the notes and mortgage for value before due, they are entitled to be protected as such, and that there is no error in the judgment of the Court below in dissolving the injunction.

Let the judgment of the Court below be affirmed.